(59 South. 996.)

No. 19,175.

BAYLISS v. GRAND LODGE OF STATE OF LOUISIANA.

(Nov. 4, 1912.)

*(Syllabus by the Court.)*

1. BENEFICIAL ASSOCIATIONS (§ 5*)—LIBEL AND SLANDER (§ 45*)—GOVERNMENT OF ASSOCIATION—QUALIFIED PRIVILEGE.

The Grand Lodge of Louisiana is a legislative body, voluntarily established by "York Rite Lodges," and composed of persons representing those lodges and their members and the general body of "York Rite Masonry," in this state, and the rules adopted by it for the governance of its constituents represent the voluntary action of those constituents and as to them, and within the "ancient landmarks" (not involved in this controversy), are of supreme authority, in Louisiana, upon all questions of Masonic obligations and conduct. The Grand Lodge, having the power, owes the duty, of determining, as to those who are subject to its jurisdiction, whether a particular organization, calling itself Masonic, is of the true body of Masonry, or is illegitimate, spurious, or clandestine, and, in the exercise and discharge of that power and duty, long ago, declared that "Cerneau Supreme Councils," asserting authority with reference to the "Scottish Rite," and all bodies holding under them, are illegitimate, and not to be recognized or held intercourse with, but that the Scottish Rite authority to be recognized by "York Rite" Masons in this state is vested in the Councils of the "Southern" and "Northern" Jurisdictions, and the bodies holding under them. When, therefore, the Grand Master (upon whom is imposed the duty of seeing that the constitution and edicts of the Grand Lodge are faithfully obeyed) learned that, without the knowledge of the Grand Lodge, a representative of an organization claiming succession from a "Cerneau Supreme Council" had been, for months, engaged in the business of selling its degrees to Master Masons of this jurisdiction, he discharged a plain duty, resting upon the Grand Lodge, and upon him as its executive officer, in addressing communications to the lodges, chapters and commanderies within said jurisdiction, advising all Master Masons that, in purchasing such degrees, they were violating the law of their organization and subjecting themselves to its penalty; and, such communications being sent in the discharge of a duty and upon a matter in which the sender and the recipients have a common interest, the occasion entitles them to a qualified privilege, and no action in damages can be maintained for their publication, unless express malice be proved.

[Ed. Note.—For other cases, see Beneficial Associations, Cent. Dig. §§ 5, 6; Dec. Dig. § 5;* Libel and Slander, Cent. Dig. §§ 138–140; Dec. Dig. § 45.*]

2. LIBEL AND SLANDER (§ 4*) — QUALIFIED PRIVILEGE—MALICE.

In communications addressed by the Grand Master to the Masons within the jurisdiction of the Grand Lodge, warning them against Masonic intercourse with an organization which the Grand Lodge had declared illegitimate, such organization was referred to as "bogus, spurious, and clandestine," and its representative, who had been engaged in selling its degrees, without the knowledge of the Grand Lodge, to Masons subject to its jurisdiction, and who, in purchasing them, violated its ordinances, was referred to as a "clandestine pretender" an "interloper" and a "peddler of degrees." Such expressions are shown to have been in common use in Masonic enactments and literature for many years, and, the evidence in this case considered, we fail to find that, in using them, the Grand Master was actuated by malice, or that malice can be imputed to the defendant Grand Lodge.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. § 111; Dec. Dig. § 4.*]

Appeal from Civil District Court, Parish of Orleans; E. K. Skinner, Judge.

Action by M. W. Bayliss against the Grand Lodge of the State of Louisiana. From a judgment for defendant, plaintiff appeals. Affirmed.

Louis A. Hubert, of New Orleans, and Monroe McClurg, of Greenwood, Miss., for appellant. Buck, Walshe & Buck, of New Orleans, for appellee.

Statement of the Case.

MONROE, J. Plaintiff charges the defendant Grand Lodge with responsibility for certain publications, which, he alleges, libeled and injured him, and he demands damages. The specific averments as to the publications in question are:

That, on March 14, 1908, defendant issued an edict, or circular, signed by its Grand Master and Secretary, declaring:

"That your petitioner is trying to establish in this city and state certain Scottish Rite bodies, of which petitioner is the head, and is making representations which are bogus, spurious, and clandestine, meaning and intending thereby to discredit and injure your petitioner's good name and reputation; that said statements are entirely false, scandalous, malicious, and defamatory of your petitioner's good name and reputation."

"That, on March 24, 1908, defendant, without just cause or provocation, issued, under its official seal, from the Grand Master's office, an edict or circular, purporting to have been signed by the Grand Master * * * and its Grand Secretary, * * * in which * * * the said officers * * * did aver that your petitioner, mentioning him by name, as follows, 'One M. W. Bayliss,' claimed to be the 'head or representative of lawful Supreme Council of Sovereign Grand Inquisitors General of the Thirty-Third, and last, Degree of the A. and A. S. Rite for the United States of America, their territories and dependencies,' is a 'clandestine pretender,' and 'has peddled Masonic degrees'; that said edict or circular further refers to the 'spurious, and clandestine character of 'Bayliss Masonry,' meaning and intending thereby to convey the idea that your petitioner is making false representations and committing deeds which are dishonorable and reprehensible; that in said edict or circular said Grand Master declares, 'I appeal to all faithful brothers to crush this interloper in his incipiency,' meaning thereby to injure the good name and reputation of petitioner. Petitioner declares that said statements are entirely false and scandalous, malicious, and defamatory of your petitioner's good name, and * * * did injure the reputation and standing of your petitioner, as well as his reputation as an honest man, * * * in the full sum of $40,000."

And there is a further claim for $10,000 for mental suffering and humiliation.

The publications complained of are annexed to the petition and will be more particularly referred to hereafter.

Defendant pleaded exceptions of "vagueness" and "no cause of action," and, on the merits, pleaded justification, coupled with denial of the alleged damage, or of liability therefor.

It is admitted that Modern Masonry dates from the organization of the Grand Lodge of England, in London, in 1717, and, whilst entire harmony did not immediately follow that event, the "Ancients" and "Moderns" in 1813 joined in forming the "United Grand Lodge of England," "since which time" (to quote an accepted authority) "the craft in the United Kingdom has been undisturbed by schism or other serious dissension." At the time of the organization of the Grand Lodge, in 1717, "there was, so far as shown, only a single ceremonial, or degree; but within six or seven years, or by 1724, the three symbolic degrees, Entered Apprentice, Fellow Craft, and Master Mason, had made their appearance," and at the reunion, in 1813, "Ancient Masonry" was decreed to consist of those degrees, including the "Holy Royal Arch," and they are now universally recognized as underlying all Masonic systems or rites; the term "York Rite Lodges" being not uncommonly applied to the lodges, otherwise called "Blue Lodges," in which they are conferred, though upon that subject we find the following in the publication already referred to, viz.:

"It is of interest to American Freemasons to note that the expression 'York Rite Masons' has little or no basis; that it is, in fact, a misnomer. There has been, and is, no York Masonic Rite, and the symbolic Freemasonry, which the world knows, did not come from the 'Grand Lodge of All England,' founded at York in 1725, but from the 'Grand Lodge of England,' founded at London in 1717." Cyclopædia of Fraternities (Stevens), verbo "Freemasonry"; Century Dic. & Cyc., verbo "Freemason."

In the work first above referred to, it is said:

"In the United Kingdom, during the eighteenth century, the adoption of 'higher,' or additional Masonic degrees was limited to the Royal Arch, Knight Templar, and Mark Master Mason degrees; but in France, very soon after Freemasonry was introduced there, many new degrees and rites made their appearance, in peddling which their inventors did a thriving business. * * * In 1754, at Paris, the Chevalier Bonneville brought together and systematized 25· of the older and better productions, among those high grades, as the 'Rite of Perfection,' under the title 'Chapter of Clerment.' Some of them were called Scottish, because their

legends traced their origin to Scotland. * * * In the Rite of Perfection, Chapter of Clerment, one finds the origin of the Ancient, Accepted Scottish Rite, 33 degrees, which was created and first appeared at Charleston, S. C., in 1801. Of this rite, Gould (F. R.), in his 'History of Freemasonry' (volume III, page 273), says: 'Although one of the youngest of the Masonic Rites, it is, at this day (1886), the most popular and the most extensively diffused. Supreme Councils or governing bodies of the rite are to be found in almost every civilized country, and in many of them it is the only Masonic obedience. * * *"

There may be those who will controvert the statement above quoted, concerning the use of the expression "York Rite," and that concerning the introduction into this country of the Scottish Rite, and it is no part of the purpose of this opinion to undertake the determination of such controversy; our immediate object being merely to establish a basis from which to present intelligibly the issues which are to be determined.

It is admitted that Scottish Rite degrees can be conferred upon none save the holders of the symbolic degrees, and hence that the Scottish Rite organization can draw its recruits from no other source than the Blue (otherwise called York Rite) Lodges. It is admitted that expulsion from a Blue Lodge carries with it deprivation of membership in all other Masonic bodies. It is admitted that the Blue Lodges and the members thereof, within the different Masonic jurisdictions of the United States, are subject to the control of the Grand Lodges established within such jurisdictions, respectively; that the Grand Lodges are legislative bodies composed of their actual officers, their Past Grand Masters and the Masters and Wardens, in office (when duly installed), of their constituent (Blue) Lodges; and that the territorial limits of those jurisdictions are coincident with those of the different states of the Union. It is not disputed that, for many years prior to the time of the occurrences out of which this litigation has arisen, there existed an organization known (stating the title briefly) as the Supreme Council for the Southern Masonic Jurisdiction, which claimed (and claims) supreme authority in the matter of conferring Scottish Rite degrees within the limits of certain of said states, and another organization, known as the Supreme Council for the Northern Masonic Jurisdiction, which claimed (and claims) like authority within the limits of the other states; and it is shown beyond question that the two bodies thus mentioned are recognized by all the Grand Lodges in the United States, as also by the Masonic governing bodies in practically all of the countries of the civilized world, save, perhaps, those of France and its colonies, with which, as we understand it, no other Masonic organizations now fraternize. It is further shown, by the evidence in this record, that the different Grand Lodges in the United States, in the exercise of the supreme Masonic authority within their respective jurisdictions, assume the right and power to determine and declare what bodies shall and what shall not be recognized by their constituent Blue Lodges and the members thereof as Masonic, and that the edicts or enactments in which such right and power is assumed, as also those in which particular bodies are denounced as unmasonic, bogus, spurious, and clandestine, as to such Blue Lodges and members, are promulgated annually as parts of the proceedings of the annual meetings, and are exchanged between such Grand Lodges, and that they are accessible to any student of Masonry who may be interested in ascertaining the action taken by any particular Grand Lodge on that subject. It is further shown that at the "Annual Grand Communication" of the Grand Lodge of Louisiana for the year 1890 the Committee on Masonic Law and Jurisprudence made a report, which was adopted, and which reads in part as follows:

"In regard to that portion of the Grand Master's address relative to those organizations known as 'Cerneau Supreme Councils,' your committee have had the same under consideration and submit the following report: The Grand Lodge of Louisiana had occasion, many years ago, to take the position and act in regard to similar, if not the same, organizations, and had no doubt then, nor has it ever since had doubt, as to its capacity and right to act upon and determine the legitimacy of any body pretending . to be Masonic and claiming recognition, directly or indirectly, or which might pretend to establish bodies in Louisiana. It has, by resolution, condemned, and refused to hold any Masonic intercourse (with), or to recognize, several bodies, claiming to be Masonic, which have encroached in any way upon the jurisdiction and sovereignty of the Grand Lodge of Louisiana or upon any of the sister Grand Lodges with which it is in fraternal correspondence, and has, a long time since, recognized those organizations of Masons whose acts have been favorable to the due exercise of full sovereignty by the Grand Lodge within its jurisdiction. It has acquiesced in, and frequently asserted, the doctrine that two Grand Bodies, without at least the concurrence of both, cannot exercise or hold jurisdiction in the same territory at the same time; and hence it follows that it cannot recognize any body claiming to be Masonic which encroaches upon the jurisdiction of any other Masonic body which it has previously recognized as legitimate. Having in view the past action of the Grand Lodge, and seeing no reason why the Grand Lodge should now reverse that action, your committee cannot see why the Cerneau Supreme Councils should be regarded as legitimate Masonic bodies, they being in jurisdictional conflict with Masonic bodies heretofore, directly or indirectly, holding the Grand Lodge as legitimate, and feel bound to consider the Cerneau Supreme Councils and all bodies of Masons holding under them as illegitimate and not to be recognized by this Grand Lodge as entitled to receive any recognition whatever. Your committee do not deem it necessary for the Grand Lodge to adopt any further legislation upon this subject, deeming this 'formal expression of opinion sufficient to guard our brethren against any recognition of the Cerneau bodies as claiming to be Masonic and against having any Masonic intercourse with them. Your committee refer to the second resolution, on page 89, of the proceedings of 1858, and the third resolution, on page 66, and adopted on page 88, of the proceedings of the Grand Lodge of 1885, as direct confirmation of the views expressed in the body of this report. Fraternally submitted. * * *"

The volume containing the proceedings of the meeting of 1858, though probably offered in evidence, does not appear in the collection of books and documents which have been brought up with the transcript before us; but we find, in the volume containing the proceedings of the Grand Lodge of Louisiana in 1885, the following, to wit:

"Resolved, that the Grand Lodge, Free and Accepted Masons, of Louisiana, adopt and put forth, as true enunciations of Masonic law, the following resolutions, to serve as a code of Masonic International Grand Lodge Regulations:

"(1) A majority of the lodges constituted in a territory may organize a Grand Lodge, with all the powers conceded to a Grand Lodge: Provided, not less than three lodges do concur therein and all the lodges within the territory have been duly notified of the intended action to form a Grand Lodge.

"(2) A Grand Lodge, thus legally constituted in a new territory, is sovereign over the whole territory, and all the lodges therein located must yield obedience to her and receive new charters from her, or be considered in insubordination and clandestine and spurious.

"(3) The Grand Lodge of Louisiana has exercised the right, and claims that it is her duty, as well as that of every other Grand Lodge, as the foundation and basis of all Freemasonry, to ascertain and declare what institutions or bodies, claiming to be Masonic or calling themselves Masonic, are really Masonry and of the true body of Masonry, or fraudulent, spurious, or clandestine, and warn the craft of Louisiana against such as are not legitimate and true, even by prohibitive edicts, if necessary."

The resolution (with some other paragraphs) was adopted, after being amended by substituting the word "irregular" in lieu of "clandestine and spurious," in paragraph 2, and by adding certain words to paragraph 5 with which we are not here concerned.

Plaintiff asserts that the body of which he is the head has succeeded to the authority of a similar body established in New York in 1807 by Joseph Cerneau.

In his testimony (on cross-examination) we find the following:

"Q. How do you reconcile your claim with the historical facts that the Supreme Council of the Southern Jurisdiction was organized in 1801, and Joseph Cerneau, from whom I believe all your bodies claim direct— A. Yes; direct. Q. I believe somebody said that you did not claim to be a descendant from Cerneau; but, since you admit that, it is all right. Cerneau did not come to New York until 1806 or 1807. A. You wish to know from me how it was that the Supreme Council of the Southern

Jurisdiction was recognized in 1801, and Joseph Cerneau had come to New York in 1807? Q. Yes, sir. A. Scottish Rite Masonry, in 33 degrees, existed for over 60 years before any body was organized in the city of Charleston. It was organized under the authority supposed to be brought by August de Grasse-Tilley. He is said to have brought the rite to Charleston and to have organized it there under what is known as a French version of the constitution of 1786, said to have been promulgated by Frederick, Crown Prince of Prussia, which constitution Albert Pike proves conclusively to have been a forgery, and under which that body worked until 1859, when they threw the French version out and adopted a Latin version, which one of the most intelligent members of the Supreme Council for the Northern Masonic Jurisdiction—its Lieutenant Grand Commander, Enoch Terry Carson—in 1869 proved * * * to be a forgery, and said that it was forged in New York. * * * Q. * * * I ask you whether the constitutions of 1762 and 1786, whatever they are and wherever they came from, are not to-day recognized as fundamental laws by the Supreme Councils for the Northern and Southern Jurisdictions in the United States and of every Supreme Council in fraternal relations with them? A. All do, as far as I know, except the Supreme Council for the Northern Jurisdiction, which stated that it is governed by the constitutions of 1762 and 1786 *and* the secret constitutions of the order. * * * Q. You stated that Cerneau got his degrees from Morin? A. No, sir; I did not. I said that Henry A. Franklin got them from Morin. Q. Where did Cerneau get them from? A. From a gentleman named Matthew Depotet, who, I believe, was a member of the Supreme Council of Kingston, Jamaica, of which Itter was Grand Commander."

Being asked how many Scottish Rite bodies there are in this country, he replied: .

"I can only give you a guess on that. I should guess five, six, perhaps seven or eight; there may be ten. I can name them for you, but may leave some out. Q. You are the Grand Commander of one of these Scottish Rite bodies? A. I am the only one."

At another place in his reported testimony, we find that the witness admits that there are, in the United States, two Scottish Rite bodies, each claiming succession from Cerneau and having their headquarters in New York, which are hostile to each other—the one, known as the Seymour-Peckam-Orr-Gourgas Body, and the other as the Hopkins-Thompson-Orr-Gorman Body, and he states that his organization is the one last mentioned. Again he says:

"All Scottish Rite Masons in this country are wrong except the body that I have the honor to represent. * * * Q. Is there a single Council in the world that you are in fraternal relations with? A. No, sir; not as far as my knowledge goes, and we don't want any— Now I want to explain. By Mr. Hubert (plaintiff's counsel): Explain why you are not in communication with other bodies. A. The remarks made by Mr. Buck would lead to the belief that Supreme Councils are large, powerful, organizations. I can have a Supreme Council with three men, a Commander, Secretary General, and a Representative. Some gentlemen from Washington went over to Europe last summer and were entertained by aristocracy—visited the German army maneuvers—men of high character and social standing, and even went so far as to take dress suits in suit cases, for the purpose of— By Mr. Buck: Is that from personal experience? A. I was not there. * * * * "

There was offered in evidence, on behalf of plaintiff, what purports to be a "certificate of incorporation," showing that "under and by virtue of the authority granted * * * by the Supreme Council of Sovereign Grand Inspectors General, Thirty-Third and Last Degree of the Ancient and Accepted Scottish Rite of Freemasonry for the United States of America, Their Territories and Dependencies, of which William Hershiser, of Columbus, Ohio, is Grand Commander," the plaintiff, with George Gibson and four other persons, on January 21, 1896, established, in Washington city, a corporation, the name of which is given as 'the Supreme Council of Sovereign Grand Inspectors General, Thirty-Third and Last Degree of the Ancient and Accepted Scottish Rite of Freemasonry for the United States of America, Their Territories and Dependencies."

There was also offered a similar instrument purporting to show that, on June 7, 1904, "under and by virtue of the authority granted by the Supreme Council" (as in the instrument above referred to), "organized in the city of New York on the 28th of October, 1807, and of which Major W. Bayliss is Sov-

ereign Grand Commander," the said Bayliss, Gibson, and others amended the charter of 1896 in some particulars.

It thus appears that the creature assumed the name, and apparently all the powers, of the creator, or corporation under and by virtue of whose authority it acquired its existence. Whether there are now two corporations, or one, and whether plaintiff is Sovereign Grand Commander of one or both, seems uncertain. We, however, infer from his testimony that he represents the whole interest, whatever it may be, to the extent authorized by the instruments which he has produced, and he says that he has occupied his present position since 1896. Beyond that, he admits considerable familiarity with Masonic history, ancient and current, and exhibits more than he admits, and he also admits that he is a writer upon such matters, and is confirmed in that respect. In regard to the manner in which he has discharged, in general, what he conceives to be the duties of the office that he thus holds, and, in particular, with reference to his dealings in Louisiana, we find that he has expressed himself as follows: In an address to his Supreme Council, delivered in 1899, he is reported to have said:

"The arrogance displayed by those York Rite bodies has caused the fraternity to split up into factions, until, at this time, unrest prevails and rival Grand Lodges are contending for supremacy in more than one jurisdiction. A rival Grand Lodge has existed, for several years, in the state of Ohio and another in the state of Pennsylvania."

In 1901, in a similar address, he is reported to have said:

"As at present constituted, the Supreme Council," (meaning his own organization) "has to depend upon the York Rite for sustenance, and it is in the power of the York Rite to stamp this Supreme Council out of existence. How to guard against such an emergency is a question of vital importance to us. When the York Rite orders its Master Masons, under penalty, not to receive any of the degrees of the Ancient and Accepted Scottish Rite in bodies of our obedience, our bodies die. They simply have to close up. We exercise no authority over the degree of Entered Apprentice, Fellow Craft, or Master Mason, but receive all our candidates from York Rite Lodges. The York Rite has become corrupt in several states. It has departed from the original plan of Masonry; it has violated the landmarks of the order; it has broken the assurance given to each and every candidate before its altars; and, in some states, it has degenerated into an instrument of persecution, under the direction of the so-called Scottish Rite Masons, owing allegiance to the bodies known as the Northern and Southern Jurisdictions."

In 1904, in a similar address, he is reported to have said:

"We are a regular and legitimate Scottish Rite power, which limits its candidates to Master Masons in good standing and who owe allegiance to regular and recognized Grand Lodges. If Grand Lodges or other Grand Bodies forbid their members *purchasing* our degrees or becoming members of our Rite, they injure this Supreme Council and stay the progress of a corporation which has a legal right to conduct its business in a lawful manner. If such course should be pursued, we would be compelled to protect our interests, and bodies so acting would have to suffer the consequences. We make war upon none. We have no desire to injure any organization, and we sincerely wish to preserve peace and harmony among all brethren of the mystic tie. We must proceed to establish branches of *our business*, and, if we are attacked or interfered with, we must defend ourselves in every way which is legitimate and Masonic. Such, my brethren, is the present status, and it is for you to say what shall be done." (Italics by the court.)

He gave the following, with other, testimony concerning his activities on the trial of this case:

"Q. (by his own counsel): Mr. Bayliss, as head of that organization, have you been doing business in other states besides the state of Louisiana? A. I have. Q. Name some of the states, please. A. I have been doing business in Arkansas. I have been doing business in Louisiana. I have done business in Maryland. I have done business in the District of Columbia. Do you wish me to enumerate the states in which I have done business, more or less? I have done business in Massachusetts. I have done business in New York. I have done business in Rhode Island, and in numerous other places. Q. Are you still doing— A. I am, when opportunity offers."

Being asked whether a majority of the Grand Lodges in the United States have not decided that his organization is clandestine

and unlawful, bogus, and spurious, he replied that he had never counted them and could not answer the question. Being asked if he knew anything of the cases in Michigan, Ohio, and California, in which the legality of his Rite was involved, he replied that he was not at all familiar with those cases—the facts with regard to (at least) one case, in Ohio, being that his predecessor in office, William Hershiser, having been expelled from his Blue Lodge because of his affiliation with the Cerneau Rite, was refused redress by the courts (Hershiser v. Williams, 53 Ohio St. 663; Id., 6 Ohio Cir. Ct. 147), and that, in one of his addresses, in 1898, plaintiff nevertheless made the statement:

"The Grand Master of the Grand Lodge of Ohio asserts that William Hershiser and others were expelled because they 'sought to propagate spurious Lodges of Cerneaus.' This statement of the Grand Master of the Grand Lodge of Ohio is false."

Plaintiff testifies that it is absolutely untrue that, wherever his bodies have gone, they have created dissensions; that, apart from Grand Lodges, the Grand Chapter of California, the Grand Commanderies of Ohio and Alabama, and the Imperial Nobles of the Mystic Shrine had taken action against his organization (or bodies); that he "never knew" before coming to Louisiana (with reference to the business out of which this trouble has arisen) that there was any (Masonic) law either for or against the Masons of this state affiliating with his organization. Being asked:

"Did you make any inquiries about it?"

—he replied:

"No, sir; only, as I stated, the District Deputy of your Grand Lodge I saw, and I asked him if there was any law in this state which prevented Masons from joining our body if they saw fit to do so. Q. Who is that District Deputy? A. Dr. Graybill. He took a book from his book rack and said there was no law, but he gave me to understand that it would not be safe for me to do it; in other words, that you people would not permit me to do it—if you could not catch hold of me one way, you would do it in another. * * *"

Richard Lambert testifies that he has been Grand Secretary of the Grand Lodge of this state for more than 30 years; that the offices of Grand Secretaries are open all day, and every day; that any visiting Mason desiring Masonic information will ordinarily call at his office, from which such information is constantly being furnished; that he heard that plaintiff was in the city, and, being personally acquainted with him, was astonished that he did not call.

Plaintiff was asked:

"State what you know of any effort, made in the year 1908, by your body, to establish itself in the state of Louisiana?"

—to which he replied:

"I will not be sure about the year 1908. The first reference made to me may have been in the latter part of 1907; but the first effort made was by our deputy, I presume, in his travels, by meeting and talking with others. What time it was I am unable to say; but I received a letter from a Mason asking me for information relative to the organization of bodies in this city. I forwarded that letter to our deputy, as the matter properly came under his jurisdiction, and it was for him to attend to it. He came here and gave the degrees to several—how many I am unable to state. * * * While I was there," (in Arkansas) "our deputy led me to believe that he might have trouble in this state—in other words, that the Grand Master of the Masons might take snap judgment by issuing an edict prohibiting our doing any work. I came here from Little Rock, and I visited the Grand Master; I was introduced to him. * * * I showed my certificate as a Mason * * * and convinced him that I was all right, and I told him what I had done in Arkansas, and showed him a copy of the report of the committee, as unanimously adopted there, and asked him if he would give us a hearing before he took any action. He promised me he would—that was my understanding—and I left him, believing that, before anything was done here, I would be called upon to appear before a committee, or before the Grand Lodge, or in some way, to explain this matter, and, shortly after I got home, the edicts were issued."

In a circular thereafter published by the witness he makes this statement, using the editorial "we":

"We are informed that the Grand Master attempts to justify the violation of his Masonic word by claiming that we misunderstood him relative to our work in New Orleans. We did not misinform him, but one who is so careless in his statements as the Grand Master appears to be is liable to give any kind of an excuse. During our interview the Grand Master asked if we had organized. We answered that we had not. This was the only question he asked relative to our Rite, and we replied without the least equivocation or mental reservation. We took it for granted that he knew degrees had been given, and that he desired to know whether or not bodies had been organized. If he desired to learn whether or not degrees had been given, he should have asked the question. We would have furnished any information he wished."

Being asked with regard to the document thus quoted, in which he indulges in the most violent abuse and denunciation of the Grand Master in Louisiana and of Masonic organizations and Masons who have failed to approve, or have opposed, the Cerneau Rite, he states that he caused two editions, amounting to several thousand copies, to be published and circulated, and, in answer to the question:

"You published this letter, so as to throw as much obloquy upon the Grand Master of Louisiana as possible?"

—he replied:

"Yes, I did."

Elsewhere in his testimony he says:

"The exception I take is that these Scottish Rite bodies are, to a certain extent, antagonistic. We are all brethren and Masons together, and wish to treat each other as gentlemen. In speaking of bodies, we mean organizations, and not individual members. There is nothing personal in our differences; but the Grand Master, in this case, made it personal against me, as an individual, and that is what I take exception to. Q. He made it personal against you, or the party who endeavored to introduce this Masonry here? A. No, sir; I did not. Q. It was done under your authority? A. A deputy of our Supreme Council came into your state on invitation of members of your body. Q. Whatever was done was done with your knowledge or acquiescence; yes or no? A. Yes; I turned a letter over to this deputy, for him to come here and attend to the business. By Mr. Hubert: Q. Where did you get the authority? A. From our Supreme Council; he holds a commission. Q. Who signs the commission? A. I do; I sign the commission."

We gather from the testimony, taken as a whole, that the deputy (Mr. Henderson) to whom the witness refers had been "doing business" in Louisiana for several months, and had sold degrees to some six or seven members of Blue Lodges in this state, when he intimated to the plaintiff that the time had arrived for him to put in an appearance, and that intimation, we think, was suggested by the fact that, while these Masons had been willing to purchase the degrees, some of them had become uneasy as to the propriety of their conduct, and were unwilling, without further inquiry, to risk their Masonic standing by going further and organizing a Scottish Rite Consistory, antagonistic to that already established and which was recognized by their Grand Lodge. Others do not appear to have known that there would be any such antagonism. Mr. Thurston, for instance, testifies that he called on Mr. Henderson, at the Commercial Hotel, with two lieutenants in the army (from the barracks); that Mr. Henderson conferred 32 degrees on them, in the regular form; that he took Henderson's word for it; that Henderson read to him from a book; that he might have had some other books, but the witness does not know whether they were Masonic or not; that there was a Bible, with a leather cover, but he does not know whether there was anything else on it; does not remember whether there were any lights or paraphernalia; thinks that Mr. Henderson called attention to "some figures or something", on the exterior of the Bible; when he took his obligation, he supposes it was on his "rights of being a man * * * a free-born American citizen, * * * and the right of being a Master Mason, in good standing"; he paid $25 for 32 degrees; believed that Mr. Henderson made him a member of a Scottish Rite body, "so that he

was a member of the Supreme Council of the United States," and that, if there was a consistory here where he could visit, his oath would be just as binding and allow him the same privileges as in a Blue Lodge; he was not aware, in taking the degrees, that they would not give him a standing as a Scottish Rite Mason in Louisiana; he thought he was at liberty to choose "which one he saw fit"; thought he was being made a lawful Scottish Rite Mason; the other members who were present told Henderson that he was a Master Mason, and he believes that he produced evidence enough to prove it; Henderson examined him to his (Henderson's) satisfaction; he asked witness if he was in possession of the word of the Master Mason, and witness told him that he was; Henderson did not think it necessary for him to give it. He renounced the degrees thus acquired, in obedience to the edict of the Grand Master, and has not recovered the $25 paid for them.

The member with whom Mr. Henderson seems to have had rather more to do than the others was Mr. Gross, who was quite intimate with him, and who, after getting the degrees, and (as we understand) while plaintiff was still in Arkansas, or elsewhere, wrote to the Grand Master a letter, dated February 27, 1908, and reading as follows (omitting the address):

" *    *    *    *    *    *    *

"I have been invited to join in the formation of a consistory of Scottish Rite Masons, Jurisdiction of the United States, Orient, of New York, of which Joseph Cerneau was originally Grand Master, and of which M. W. Bayliss, of Washington, D. C., is now the head. Said jurisdiction is in opposition to both the Southern and Northern Jurisdictions, Scottish Rite. I believe that the Most Worshipful Grand Lodge of Louisiana does not pretend to exercise any jurisdiction over consistory work, that its dominion is over the Blue Lodges, exclusively; but I have no desire to do any unmasonic act that might affect my standing as a member of a Blue Lodge. Therefore I write to you to ascertain your opinion in the matter. If, as a member of a Blue Lodge, I participated in the formation of a new consistory, would I violate any law of the Grand Lodge? Are the Scottish Rite degrees an integral part of Freemasonry, or viewed by the Grand Lodge as side degrees, to which any Mason may aspire, if he wishes? If, as may be probable, you are not yet fully informed as to the claims of the jurisdiction of the United States, would you have any objection to a conference with the brethren engaged in establishing this consistory, for the benefit of all concerned? I have seen a telegram stating that a committee of the Bayliss consistory had met a committee of the Grand Lodge of Arkansas and that the decision was favorable to the Bayliss committee. This matter, if it interests you or the Most Worshipful Grand Lodge, calls for immediate action, since it is more than likely that a new consistory will be formed soon, and which action, if contrary to Masonic laws, will jeopardize the standing of many well-meaning brethren who now believe that they are within their rights in assisting the new organization.

"With respect, I am yours fraternally,
"Josiah Gross, Secretary, Germania 46."

The writer of the letter was the member who subsequently introduced plaintiff to the Grand Master, but who did not remain with them during their interview. He testified, in substance, as follows: He introduced plaintiff to the Grand Master. Plaintiff wanted to convince the Grand Master that he had the right to organize higher degrees here.

"Q. Was anything said by him to you as to what he considered the law of Louisiana to be at that time; in other words, did he discuss with you the question of Louisiana ever acting on whether or not he would be permitted—or, I mean—whether it would permit or reject bodies of the Scottish Rite other than the Southern Jurisdiction? A. Between ourselves, we went over the matter very thoroughly. Q. Who do you mean? A. Brother Keenan, Brother Heroy, and, I think, Brother Anderson, and Mr. Henderson. Q. And some others? A. Yes; and others. *  *  *  He" (Henderson) "was a sort of grand representative; a sort of traveling agent *  *  * of Mr. Bayliss *  *  * or his Rite."

He represented to them that they could establish a consistory, "in opposition to the other consistory," and be just as high Masons as anybody. The price of the degrees was to be $25, until some time later, when it would be $50. The cost in the Louisiana Consistory is $150. They discussed the mat-

ter thoroughly, and came to the conclusion that the Grand Lodge did not have anything to do with us except in the thirty-third degree. Witness had not himself examined the question thoroughly, nor had any of those who were with him. The manner of receiving the degrees was:

"Mr. Henderson had a portfolio of books with him, and one night all those interested had a meeting at my office and we proceeded to take the degrees. It lasted until 1 or 2 o'clock in the morning."

Mr. Henderson read to them from a book. There was no ceremony. Witness agreed to pay $25, but never paid it. It was never asked. The others paid before getting the degrees. When the Grand Master issued his edict, they all concluded that they had better obey it. A letter was written to Mr. Bayliss to find out whether they were members of his organization, and they were informed that they were not. They renounced the degrees that they had received, before the altars of their respective lodges. Mr. Henderson had known witness a long time, and took his word for it that he was a Master Mason. There was no Masonic investigation of the matter. He thinks it was the same with the others. He thought he belonged to the Scottish Rite headed by Mr. Bayliss, but (now) understands that he does not. Reverting to the testimony given by plaintiff, he (plaintiff) admits that the constitution of his organization requires a minimum fee, for the 29 degrees, of $50, but says that he was allowed, by resolution, to reduce it, in advancing Masonry. Whether in the York, or the Scottish, Rite, it is required that the applicant, in the course of the ceremony, give some of the words, signs, or grips of the three symbolic degrees. No one should be admitted into a Masonic Lodge without previous inquiry into his character and standing. Testifying somewhat in detail as to the manner of admit-

ting members into his organization, the witness says:

"Our deputies, in going around, from place to place, in their efforts to propagate the Rite, may come across a member of considerable intelligence, one whom we would like to have interested. This deputy, in his judgment, may give the degrees to that brother, and I have an agreement with our bodies, in Washington, that this deputy can send the name of such a brother, or as many names as he sees fit, and that we will give him, or them, temporary membership in Washington, or permanent membership, if need be, according to certain circumstances. When that name, or names, come to me, I fill out an application, answering the questions called for, so far as I can, and sign it and place it before the bodies. It is referred to a committee, and, when the committee reports, a ballot is taken. That is the modus operandi of the whole thing, right through; and it is understood, before that ballot is taken, that the brother on promise will get membership, so there is no chance for any rejection."

At the beginning of his cross-examination, plaintiff was asked whether he was conscientious in alleging that he was injured by the charge that the organization represented by him in Louisiana was bogus, spurious, and clandestine, and whether he was claiming damages therefor, to which he replied:

"No, sir; not to my knowledge."

He was then asked:

"Then what do you claim damages for, Mr. Bayliss?"

And he answered:

"On account of the language calling me an interloper and peddler of degrees and a clandestine Mason, and saying that I was guilty of selling the three fundamental degrees of Masonry—the worst crime a man can be charged with."

He was interrogated as to whether or not the words "bogus," "spurious," "clandestine," and "peddling" were not words in common use among Masons and in Masonic literature, and he seemed to have some difficulty in remembering that such was the fact, but thought, with regard to the application of the expression "peddler of degrees" to an individual that he could recall

an instance in 1813. Referring to the circular issued by him, in order to cast as much obloquy as possible upon the Grand Master in Louisiana, and bearing in mind the testimony as to the manner in which Scottish Rite degrees were conferred by his authority, we find that plaintiff, some time before testifying, had written as follows, concerning an author whom he admits is an accepted authority among Masons, to wit:

"Albert G. Mackey, on the other hand, was a peddler of degrees for money. * * * In 1852 he organized what he called a consistory in New Orleans, by standing a number of Masons up in a circle, in a hotel parlor, and declaring them to be thirty-third degree Masons of the Ancient and Accepted Scottish Rite."

Beyond that, in the Masonic literature to which we are referred, and with which plaintiff, as a student in that line, cannot but be familiar, the words mentioned are in common use, and have been applied to the Cerneau bodies, and those representing them, for nearly 100 years. The evidence authorizes the conclusion that plaintiff, as the head, from 1896, of an organization claiming succession from Cerneau, and which he had determined to revive and exploit, knew, in 1907, when he sent his deputy to gather recruits in Louisiana, that such action was in violation of the Masonic law as enacted by the Grand Lodge of this state, or, if he did not know it, that his ignorance was willful and inexcusable, as the published sources of information were at his command, and it was his plain duty before engaging in such an enterprise to inform himself. That evidence further authorizes the inference that when, in his interview with the Grand Master, he informed that official that he had not "organized," he acted disingenuously, in that he failed to inform the Grand Master that his deputy, acting by his authority, had been conferring degrees upon Master Masons of this jurisdiction. The Grand Master, we think, was thereby misled, and, having supposed that plaintiff's application to him was

the first step that had been taken in the premises, he thereafter learned that it was about the last to be taken, and that the work of leading those for whose conduct, as Masons, he was, in a measure, responsible, blindly into a violation of the law of their organization, had been going on for months. Plaintiff had asked for no hearing in regard to *that* work, and, as we infer, wanted none; and he was entitled to no fulfillment of the promise of a hearing upon the question of organization, since that promise was given under a misapprehension for which he alone was responsible. Upon learning that the work of selling the degrees in question had thus been going on, without his knowledge, and, perhaps, upon more fully informing himself of the situation, as affected by the Masonic law, the Grand Master was naturally deeply concerned, and issued the edicts here complained of, which read as follows:

"Grand Master's Office.
"The Grand Lodge of the State of Louisiana.
"Free and Accepted Masons.

"James C. Drew, Grand Master.  413 South Peters St.

"New Orleans, La., March 14th, 1908.

"To the Worshipful Masters, Senior and Junior Wardens of All the Lodges within the Jurisdiction of the Most Worshipful the Grand Lodge of the State of Louisiana, F. and A. M.—Brethren:  A communication has been addressed to me, in my official capacity as Grand Master, from one of the lodges in the city of New Orleans, asking for an opinion from me in regard to the organization in this city of Scottish Rite body by one Mr. M. W. Bayliss, hailing from Washington, D. C., said body to be known as 'The Supreme Council the Sovereign Grand Inspectors General of the Thirty-Third and Last Degree, A. and A. S. R. for the United States of America, Their Territories and Dependencies.'  After very careful consideration and most exhaustive research into the matter, I have arrived at a positive and definite conclusion.  I will state, for the information of all the brethren, that the Grand Lodge, under the constitution, extends the right hand of Masonic amity and friendship to all legal governing bodies of the higher degrees of Masonry of whatever Rite, and, in this state, we recognize, as legal governing bodies, the Grand Chapter of Louisiana, the Grand Council of Louisiana, and the Grand Commandery of Louisiana, the Grand Consistory, Thirty-Second Degree

A. and A. S. R. of Louisiana, the Supreme Council of A. and A. S. Rite of the Southern Jurisdiction, and the Supreme Council of A. and A. S. Rite of the Northern Jurisdiction. These and no other Grand Bodies are recognized as legal governing bodies in this state. I find, after most careful examination and probing this matter to the bottom, that the said Mr. Major W. Bayliss is the presiding officer of the 'Supreme Council of Sovereign Grand Inspectors General, etc., A. and A. S. R.,' and that said body is designated by some as the 'Bayliss-Gibson Body,' which is known to be a branch of the Cerneau body of Masonry, which has been declared clandestine by the Grand Lodges of Ohio, Iowa, Massachusetts, Pennsylvania, and many others. The Grand Lodge of Louisiana has also taken cognizance of this matter in 1885. While there are no resolutions declaring the Cerneau body clandestine, there is strong report from the Committee on Foreign Correspondence touching upon this subject. Following is an extract from said report:

"The Grand Lodge of Louisiana has, long since, declared what is Masonry and what are Masonic bodies. Of course, all or any body not recognized by her as true and legitimate is not Masonic, and, if claimed by the peddlers of such wares as Masonic, must stand stamped as spurious, irregular, and clandestine. So, brethren, in Louisiana, beware. Touch not the unclean things not recognized by the Grand Lodges as Masonic. Have nothing to do with them, for the consequences must necessarily be Expulsion.'

"See Proceedings, 1885. (Appendix, page 10.) Following is an extract from Mackey's Encyclopedia:

"'Joseph Cerneau was a Frenchman, born in 1763 at Villeblerne; his occupation, a jeweler. He removed to the city of New York in the beginning of the nineteenth century. In 1807 he established a spurious body under the title of "Sovereign Grand Consistory of the United States of America, Its Territories and Dependencies." This Masonic charlatan, who claimed the right to organize bodies of the Ancient and accepted Scottish Rite, was expelled and his pretensions denounced in 1813 by the legal Supreme Council, sitting at Charleston, S. C. Cerneau and his adherents gave much trouble in the Scottish Rite for many years, and the bodies which he had formed were not entirely dissolved until long after the establishment of a legal Supreme Council for the Northern Jurisdiction.'

"Now, therefore, brethren, upon me, as your chosen Grand Master, is imposed the duty of seeing that the laws and regulations of this Grand Lodge are duly and strictly enforced, and from this sworn duty I shall not swerve or turn aside. The fact having been clearly established in my mind, beyond any doubt whatsoever, that the Cerneau bodies are clandestine, I, therefore, by virtue of the authority vested in me as Grand Master of the Most Worshipful the Grand Lodge of the State of Louisiana, F. and A. M., do hereby declare the bodies calling themselves 'the Supreme Council of Sovereign Inspectors General of the Thirty-Third and Last Degree, Ancient and Accepted Scottish Rite for the United States of America, Their Territories and Dependencies,' and commonly known as the Cerneau Rite, to be bogus, spurious, and clandestine, and that they ought not to be countenanced or recognized in any manner by brethren under obedience to this Grand Lodge, and I furthermore declare that any Mason, subordinate to the authority of this Grand Lodge, who shall hereafter take, or receive, or communicate, or be present at, or assist any one to take, or apply for, said degrees, or any of them, shall be subject, after due trial under the Code, to expulsion from all rights and privileges of Masonry. And I furthermore declare and command that the Grand Secretary shall furnish every lodge in this Grand Jurisdiction with a copy of this communication and the same be read, in open lodge, so all the brethren may be informed.

"Thus done and signed under my hand and seal of office in the city of New Orleans, La., on this the fourteenth day of March, A. D. 1908.

"J. C. Drew, Grand Master.
"Attest: Richard Lambert, Grand Secretary."

"Grand Master's Office.
"Grand Lodge of the State of Louisiana.
"Free and Accepted Masons.

"James C. Drew, Grand Master. 413 S. Peters St.

"New Orleans, La., March 24, 1908.
"To the Worshipful Masters, Senior and Junior Wardens of All the Lodges within the Jurisdiction of the Most Worshipful the Grand Lodge of the State of Louisiana, F. and A. M.

"Referring to the communication addressed to the Masters and Brethren of this Jurisdiction, of date March 14th, 1908, relative to the effort of one M. W. Bayliss, claiming to be the head or representative of a lawful 'Supreme Council of Sovereign Grand Inquisitors of the Thirty-Third and Last Degree of the A. and A. S. Rite for the United States of America, Their Territories and Dependencies,' I have been advised by worthy brethren that considerable number of Masons, members of lodges under our jurisdiction, have received, or accepted or had communicated or conferred upon them, the degrees 'peddled' by this clandestine pretender.

"These brethren may have acted in ignorance of conditions. They may have been imposed upon, as many seem to think that the Grand Lodge has control of only the three Symbolic Degrees, that it takes no cognizance of other degrees or branches of Masonry. The facts stated in our recent circular should disabuse their minds of such ideas and convince them that they have allied themselves with a false,

spurious Masonic body, for which the penalty, ordinarily, is expulsion from the order.

"Assuming that it was ignorance, rather than deliberate violation of their awful [lawful?] obligations, I now call on these brethren to make amends by open confession and recantation, as a condition in avoidance of charges and trials, the result of which could be nothing less than expulsion. And that the object in view may be attained, I hereby make it the duty of the Worshipful Masters of Lodges in this Jurisdiction to ascertain who, if any, of their membership have associated themselves with this clandestine body.

"The brethren who are known or who admit themselves to have done so shall be relieved of all penalty and 'healed,' by admitting their error and renouncing, in open Lodge, before the altar, on their obligations as Master Masons, their association or connection with such clandestine body; otherwise charges shall be preferred against them, as the nature of the case may require.

"I do not deem it necessary to extend this communication by further argument or proof as to the spurious and clandestine character of 'Bayliss Masonry,' nor of my duty and authority to interfere in the premises. Louisiana Masonry has fought this battle many years ago, as other states have done, where the clandestine, encouraged by temporary success, crowned their unlawful encroachments by selling even the three fundamental degrees.

"I appeal to all faithful brethren to crush this interloper in his incipiency and keep the firebrands of discord and confusion out of our temple.

"Thus done and signed under my hand and seal of office, in the city of New Orleans, La., on this the twenty-fourth day of March, A. D. 1908.

"J. C. Drew, Grand Master.
"Attest: Richard Lambert, Grand Secretary."

The edicts thus issued were published by being mailed, under seal, to the different lodges, chapters and commanderies within the jurisdiction of the Grand Lodge, and being read in the lodges, and they were sent by defendant to no other organizations or individuals. For the additional publicity given to them, by the distribution of plaintiff's circular, he alone is responsible.

### Opinion.

[1] The learned counsel for defendant insist upon their exception of "no cause of action," and argue that the matter complained of does not import a libel, and, should this court hold otherwise, that the Grand Lodge should not be condemned in damages for a libel published by its Grand Master. We pretermit the questions thus presented, for the reason that we are of opinion that the occasion was one of privilege and that the plea of justification is sustained.

It is conceded that, within the "ancient landmarks" (which are not attempted to be brought into this controversy), the defendant Grand Lodge is the sovereign authority, in Louisiana, upon the subject of the Masonic obligations and conduct of its constituent lodges and their members, and it is shown that, many years prior to plaintiff's advent into this state, in the exercise of that authority, it determined it to be its duty "to ascertain and declare what institutions or bodies, claiming to be Masonic, or calling themselves Masonic, are really Masonry and of the true body of Masonry, or fraudulent, spurious, or clandestine, and [to] warn the craft, in Louisiana, against such as are not legitimate and true, even by prohibitive edicts, if necessary"; that, some 17 years prior to the coming of plaintiff, it in effect, and by the adoption of the report of its Committee on Masonic Law and Jurisprudence, reaffirmed that determination and declaration, and, going further, warned those Masons within its jurisdiction against Cerneau Supreme Councils, and all bodies of Masons holding under them, as illegitimate and not to be recognized, or affiliated or fraternized with; that the constitution of the Grand Lodge imposes upon the Grand Master the duty "to see that they [the lodges within the jurisdiction of the Grand Lodge] work uniformly and correctly, and according to the landmarks and usages of the order, and that the constitution and edicts of this Grand Lodge are faithfully obeyed." It is further shown that plaintiff is a well-informed student of Masonic history, law, and jurisprudence, and has written for publication and delivered public addresses upon those subjects; that the pub-

lications containing the edicts or enactments of the Grand Lodge of Louisiana upon the subject of its attitude towards "Cerneau Grand Councils" and bodies claiming to hold under them, and prescribing the duties of the Grand Master, were easily accessible to him, and that he was informed, or should have been informed, as to those edicts, enactments, and duties; that it was especially obligatory upon him to acquire such information, when, assuming the position of "Sovereign Grand Commander" of the "Cerneau Rite," he determined to exploit that organization by selling its degrees to members of the Blue Lodges of this state, thereby swerving them from their allegiance to the Grand Lodge, or inducing them, in ignorance, to violate the Masonic law of the state, as interpreted by the supreme authority, and involving them in serious trouble and jeopardizing their Masonic standing and membership; that, notwithstanding his said especial obligation in the premises, and without the knowledge of the Grand Master, such degrees were sold by his authority, after which, without informing the Grand Master of what had been done, he obtained an assurance that he would be given a hearing upon the subject of organizing Cerneau bodies; that the Grand Master was thereby misled into believing that plaintiff was taking the first step towards the introduction of the Cerneau Rite into this state, and learned only at a later period that the proposed step was practically the last, and that the work of selling Cerneau degrees to Master Masons subject to his (the Grand Master's) jurisdiction had been going on, under plaintiff's authority, for months.

It is clear that, as between itself and its constituents (the Blue Lodges and the members thereof), the Grand Lodge was within its rights in enacting the law to which we have referred, for the Grand Lodge is a legislative body, created by, and of, those constituents, and the law in question was made by them, through their representatives, to be applied to themselves. It was competent for them, in that way and to that extent, to ordain that, as to their organization, any other body claiming to affiliate or fraternize with them, and particularly one introduction into which requires, in some measure, the use of their signs, words, or symbols, is bogus, spurious, and clandestine; that, as to their methods of conferring degrees and as to the officers conferring them, the methods of another body constitute peddling, and the persons by whom they are conferred, communicated, or sold are to be considered venders, peddlers, pretenders, or interlopers. If, therefore, plaintiff were a member of a Blue Lodge established in this state, he could not be heard in this suit for a moment, and in view of the fact that he is a member of a Blue Lodge in another state, and of his admissions as to the power and supremacy of the Grand Lodges, wherever they exist, it would appear to be rather straining a point to accord him a standing here, which, under similar conditions, would not be accorded him at home. However that may be, and conceding (without expressing any definite opinion on the subject) that a Mason may antagonize a Grand Lodge, other than his own, where such action would not be tolerated by his own Grand Lodge, it is evident that, when the Grand Master of Louisiana ascertained that plaintiff, through his representative, had for some time been engaged in selling prohibited degrees to Masons within his (the Grand Master's) jurisdiction, it became his plain duty to put a stop to the "business," and to warn such Masons that they were violating the law of their craft and subjecting themselves to the extreme penalty of expulsion; and the duty which thus devolved on him in his official capacity was the duty of the Grand Lodge, a corporate body, which was necessarily imposed upon, and to be dis-

charged by, one of its human representatives. Moreover, the Grand Lodge, as the order itself, or the legal entity representing the order, in this state, had an interest, in common with all of its constituents, members, in the enforcement of the rules of the order and in the maintenance of unity and harmony within its ranks. The occasion when the edicts were issued, whether their issuance be regarded as that of the Grand Master alone, or of the Grand Lodge acting through him, was, therefore, for both reasons, one of qualified privilege, and the only question left for consideration is whether the language of the edicts exceeded the privilege which the occasion afforded, and inflicted upon plaintiff wanton and needless injury. It will be remembered that plaintiff states, in his cross-examination, that he claims no damages for the use of the words "bogus," "spurious," and "clandestine," as applied to his council, and he rests his complaint upon the alleged charge of "selling the three fundamental degrees of Masonry," of being a "peddler of degrees," "clandestine pretender," "clandestine Mason," and "interloper."

As to the alleged charge of selling the fundamental degrees, we do not find it in either of the edicts; the only statement on that subject being that contained in the edict of March 14th, which refers to another period and other persons.

[2] With respect to the other terms or expressions complained of, it might be sufficient to say that they appear to have been used in Masonic enactments and literature almost from time immemorial, and many times, during many years, with reference to Cerneau Councils and their originator. Plaintiff himself seems to define the "peddling of degrees" when he says, in his published circular, of Mackey, the author of a Masonic Digest (and long since dead, as we assume), that:

"He was a peddler of degrees for money. * * * In 1852 he organized what is called a consistory in New Orleans, by standing a number of Masons up in a circle, in a hotel parlor, and declaring them to be thirty-second degree Masons of the Ancient and Accepted Scottish Rite."

And Mr. Henderson, acting under plaintiff's authority, appears to us to fall within that definition, for he was a peripatetic vender of degrees, who assembled those to whom he sold them, at one time in his hotel room, and at another time in a private office, and sold them 29 degrees (which carried with them membership in no organization whatever), some for money, and some on credit, and in all cases at a much reduced price, as compared with the cost of such degrees in the Scottish Rite body recognized by the Grand Lodge of this state, whose constituents alone are qualified to receive such degrees.

The son of James Stuart is known in history as the "Pretender," and his son as the "Young Pretender," though there was a time when James was the lawful king of England and his son the lawful heir to the throne; and so, though it should be conceded that there was a time when the Cerneau Council was the Supreme Scottish Rite authority in this country, yet, as it has been superseded for 100 years, or 50 years, and another authority has taken its place, its intrusion into territory which, with the consent of those who alone are concerned in the matter, is occupied by another authority, places it in a position certainly no better than that of the Stuart or Carlist pretenders, or that of a revolutionist, who, failing in his enterprise, is called a rebel.

The use, in the edicts, of the words "clandestine" and "interloper" are also justified by the facts. Plaintiff knew, or should have known, that he could not sell the degrees of his rite in Louisiana, to the knowledge of those in authority over the Master

Masons to whom alone they could be sold, and through his representative he engaged in the "business" of selling them "clandestinely," and was an "interloper" in the same sense that any one is engaged in clandestine business who, without the knowledge of those having lawful authority over others, engages in traffic with such others, and weans, or endeavors to wean, them from their obligations of duty and allegiance.

We have plaintiff's word for it that he is doing, or has done, "business" in several states, and in his address to his Council in 1904 he said:

"If Grand Lodges or other Grand Bodies forbid their members *purchasing* our degrees or becoming members of our Rite, they injure this Supreme Council and stay the progress of a corporation which has a legal right to conduct its *business* in a lawful manner. If such a course is pursued, we would be compelled to protect our interests, and bodies so acting would have to suffer the consequences." (Italics by the court.)

His idea of the work in which he is engaged seems, therefore, to be that it is a "business," which may consist of inducing Master Masons, in violation of obligations which they have voluntarily assumed, to "purchase degrees" offered by him, and that, if the order in whose favor those obligations have been contracted objects or interferes, it, and it alone, must suffer the consequences. We, however, are of opinion, as we have stated, that the bodies to which plaintiff refers have also the right to protect themselves, and to protect those persons having interests in common with them, by at least calling the attention of the latter to the compact into which they have entered, and to the estimation in which, according to the terms of that compact, the traffic in which plaintiff is engaged is held.

"Where words imputing misconduct to another are spoken by one having a duty to perform," says an American author, "and the words are spoken in good faith and in the belief that it comes within the discharge of that duty, or where they are spoken in good faith

to those who have an interest in the communication and a right to know and act upon the fact stated, no presumption of malice arises from the speaking of the words, and therefore an [no] action can be maintained in such cases, without proof of actual malice." Newell on *Defamation, Slander and Libel*, p. 479.

See, also, to the same effect (as to the law of England), Odgers on Libel and Slander (5th Ed.) p. 252. The author last above referred to illustrates the application of the doctrine stated by the citation of the following, among other, cases, to wit:

In Rabshaw v. Smith (1878) 3 L. T. 423, it appeared that plaintiff had business relations with the London & Yorkshire Bank, the manager of which, on being applied to for information concerning plaintiff, showed the applicant, Hudson, an anonymous letter which the bank had received and which contained the libel complained of:

"Held, that handing the letter to Hudson, in confidence, was a privileged communication."

Grove, J., in refusing the rule for new trial, made the following remarks:

"The defendant did not act as a volunteer, but was applied to for information. When applied to, he did give such information as he possessed. He might have refused to give that information. He had no legal duty cast upon him to give any opinion. But he was entitled to give his opinion, when asked, and, a fortiori, as it seems to me, to show any letters that he had received bearing upon the subject." Odgers on Libel and Slander (5th Ed.) p. 256.

"The reports of the directors and auditors of a company, printed and circulated among the shareholders, are privileged." Lawless v. Anglo-Egyptian Cotton Co., L. R. 46 B. 262. Id. 282.

"A solicitor, acting for some shareholders of a company, printed and sent to the shareholders, but to no one else, a circular reflecting on the promoters and directors of the company, and inviting the shareholders to meet and discuss their position and take measures to protect their interests. Held, that such a publication was privileged. Quartz Hill Gold Mining Co. v. Beall, 20 Ch. D. 501. Id. 282.

"A communication, from a firm of brewers, to the tenants of their public houses, refusing to accept any longer in payment checks drawn on a particular bank, is privileged." Capital and Counties Bank v. Henty and Sons (C. A.) 5 C. P. D. 514. Id. 283.

Certain merchants in New York, believing, on reasonable grounds, that they had been defrauded by plaintiff and others, drew up an agreement, reciting that they had been "robbed and swindled" by plaintiff and others, named, whom they were determined to prosecute, and promising that each person signing would pay his fair share towards the expenses of the prosecution, etc. This agreement was left with A.'s manager, in order that he might procure A.'s signature thereto. Held a privileged publication. Klinck v. Colby and Others, 1 Sickels (46 N. Y.) 427, 7 Am. Rep. 360.

We may note, in conclusion, that the communications here complained of were not volunteered. They were called for by the letter of Josiah Gross, written in his capacity of secretary of one of defendant's Blue Lodges, on behalf of himself and other Master Masons subject to defendant's jurisdiction.

For the reasons thus assigned, we are of opinion that the learned judge a quo committed no error in rejecting plaintiff's demand. The judgment appealed from is, accordingly, affirmed.

BREAUX, C. J., takes no part.